**Dwayne FRENCH, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 45S00–8710–CR–991.**

Supreme Court of Indiana.

July 12, 1989.

Nathaniel Ruff, Appellate Div., Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Preston W. Black, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

Appellant was charged in two counts, one Murder and one Felony Murder. A jury trial resulted in a finding of guilty on both counts. However, the trial judge merged the counts and sentenced appellant only on the felony murder count. He received a sentence of forty (40) years.

The facts are: In September of 1985, 12–year–old Linda Perez disappeared from her home in Gary, Indiana. She was last seen about 8:00 p.m. by her brother, who saw her playing at the residence of appellant.

The victim's body was subsequently found partially buried in a vacant lot next to appellant's home. On November 5, 1985, her body was exhumed from a shallow grave. The following day her underpants were found close to the grave. Dr. Dean Hawley, a forensic pathologist, performed the autopsy. He found two stab wounds in the victim's body. The stab wound which caused her death was through the left lung. The other stab wound was in the right groin. Dr. Hawley testified that the stab wounds were made with a cutting blade.

During the course of an investigation, Police Officer Michael Valsi of the Gary Police Department arranged for the administration of a polygraph test to five people, including appellant and his sister. All persons involved were notified that the taking of a polygraph was voluntary.

Appellant's parents, Betty Love and Edgar French, were contacted as to whether the children would be willing to take a polygraph examination. Both parents cooperated fully with the police. Mrs. Love brought appellant and his sister to Polygraphs Unlimited, which was operated by Ronald Flemming, who was also a Gary Police Officer. When Mrs. Love arrived at Polygraphs Unlimited with the children, she was advised by Officer Valsi that she could either sit in the examination room or in the lobby. Mrs. Love chose to sit in the lobby.

Appellant's sister was examined first with no remarkable result. Shortly after the examination of appellant began, Flemming advised Valsi that appellant was not telling the truth. Upon hearing that remark, appellant burst into tears and stated that he was in fact telling the truth. At this point, appellant's mother entered the room and attempted to console him. The polygraph examination was terminated immediately and Officer Valsi advised Mrs. Love that her son should be taken to police headquarters, that she could take him herself, or he would take him to police headquarters. It was determined that Officer Valsi should transport appellant to headquarters.

Mrs. Love indicated that she would take her daughter home and pick up her husband. Appellant was not questioned during the ride to police headquarters. Appellant was not questioned before his parents arrived at the police station. After the parents arrived, appellant was placed under

arrest and his parents were so advised. In the presence of the parents, appellant was given his full *Miranda* warnings.

Officer Martinez explained each of the rights to appellant and to his parents in the presence of three other police officers. Appellant and his parents indicated that they understood the rights. Appellant and each of his parents initialed each of the rights.

After the rights were explained, appellant was allowed to confer with his parents in private for as long as they desired. They spent about fifteen to twenty minutes together. During this consultation, appellant told his parents that he had killed the victim. After conferring with his parents, appellant indicated he wanted to give a statement. Officer Martinez explained that appellant would have to sign a waiver of rights in order to give a statement. Appellant was asked again if he had any question about his rights. Appellant indicated he wished to voluntarily waive his rights. The waiver section was then signed by appellant, his parents, and the four police officers in attendance.

In his statement, appellant admitted that he had killed and buried the victim. After the statement was concluded, appellant and his parents were asked to review the document. Appellant and each parent initialed every page. During the entire time, appellant was treated kindly and politely. Police officers did not coerce him or make promises to him. He was allowed to use the bathroom, he was given water and pop, and he was allowed to take breaks as he gave his statement.

Appellant claims his confession was involuntary because of improprieties at the time of the polygraph examination. He claims he should have been given his *Miranda* warnings prior to the examination. However, the evidence in this case is that appellant was not in custody at the time the polygraph examination was administered. Both he and his parents were told that the submission to the polygraph was entirely voluntary and they agreed that appellant should take the test.

At the time, the test was being administered successively to five different people in an effort to ascertain what any of them might know about the incident. The requirements of *Miranda* do not apply except under custodial interrogation. When it was first indicated by the polygraph operator that appellant was not telling the truth, the questioning ceased. Appellant did not at that time make any statement admitting guilt; in fact, he denied that he was not telling the truth.

Prior to being placed under arrest, appellant was given full access to both parents, his *Miranda* rights were given in the presence of both parents, and each indicated they were anxious that the truth be discovered. It was only then that appellant was placed in custody and in the presence of his parents gave a full statement of his guilt. Under such circumstances, appellant's statement was properly received. *See Johansen v. State* (1986), Ind., 499 N.E.2d 1128.

The trial court did not err in permitting evidence of appellant's confession to go to the jury.

The trial court is affirmed.

SHEPARD, C.J., and PIVARNIK, J., concur.

DeBRULER, J., dissents with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, dissenting.

Appellant was twice questioned by the police in their routine investigations and they doubted his word. He and his sister were then invited to take a polygraph test, and he was brought to the polygraph office by his mother. This was a private business. The offices consisted of two rooms, a waiting room and an examination room. The mother stayed in the waiting room by choice, and appellant was taken to the other room. The room was small, measuring ten by sixteen feet. Officer Valsi who was in full uniform was present in the room with Officer Flemming who conducted the examination. Appellant was attached to the machine. No *Miranda* rights were given.

Appellant was questioned for forty-five minutes. He was asked whether he knew who had killed the victim, whether he was present when she was killed or died, and whether he had killed her himself, etc. Flemming said at one point to Valsi in a voice that could be heard by appellant that he, appellant, was not being truthful. Appellant at one point began sobbing. The officers were careful to testify that he had not incriminated himself while under their questioning, but did testify, however, that as he was released from the machine, his mother entered the room and appellant threw himself in her arms saying that he had not been telling the truth and that he had had something to do with the murder.

The decision to take appellant to the police station for questioning was then made, and appellant was transported by the police and arrested within minutes after arriving there. By the time his parents arrived there, some one hour later, appellant was under arrest. He and his parents were read *Miranda* rights; they were given an opportunity to confer and both executed written waivers. Appellant was then interrogated and gave the confession challenged as inadmissible.

The Fifth Amendment requires the suppression of the confession given by appellant at the stationhouse because that confession and the waiver of rights which preceded it were the tainted products of, and came about by, exploitation of illegal police custodial interrogation. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Clearly, there was a criminal interrogation during the administration of the polygraph examination. It is equally clear that after appellant, a thirteen-year-old boy with learning problems, was seated in that small separate room, physically attached to a stationary machine by wires and gadgets, surrounded by two grown men, one of whom was in full uniform, and questioned in an accusatory fashion for a period of forty-five minutes, he was surely "deprived of his freedom of action in [a] significant way." *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In *Mathiason,* a grown man went on invitation to a state patrol office where he sat across a desk from a lone policeman. He orally confessed after five minutes, was given his *Miranda* rights, gave a taped confession, and was permitted to leave. Here, by contrast, appellant was not a man, but a boy. He was physically and psychologically restrained by the machine attachments and was confronted by two men rather than one. He was questioned in an accusatory manner for forty-five minutes rather than five. He was not offered an opportunity to leave for parts unknown as Mathiason was, but was under orders to report to the police station for further questioning. Unlike Mathiason, appellant French *was* in custody for the purposes of requiring an advisement of the privilege against self-incrimination and the right to counsel.

Upon being released from the machine, appellant threw himself in his mother's arms, admitting that he had had something to do with the crime. In these circumstances, the burden was upon the State to prove beyond a reasonable doubt that the subsequent stationhouse confession and the written waiver of rights were not the fruit of his unlawful polygraph office interrogation. *Brown,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. Here, appellant was in police custody from the time he left the polygraph office until he confessed. The offer to permit the mother to transport him to the stationhouse is a relevant intervening circumstance, but is limited in that regard because the offer still left appellant under control of an adult and under orders to report to the police station. Appellant was placed under formal arrest upon arriving at the police station and before his parents arrived. This is an immediate continuation of the pressures started in the polygraph interrogation. He and his parents were given *Miranda* advisements for the first time and they executed a waiver. This is palliative but more than offset by the fact that appellant and his parents would have been under a pressure to waive their rights and give a second statement, since the boy had been confronted with the examiner's conclusions of falsehood and had responded by admitting that he had

had something to do with the death. No other significant intervening circumstances existed. On this evening, only appellant and his sister were scheduled for polygraph examinations. The police were in the process of investigating their most obvious suspect and knew that, because of his age and mental problems, it would not be difficult to surprise, frighten and confuse him. The official misconduct here is of a serious nature. The State failed to sustain the burden of showing that the stationhouse confession in question was admissible.

I would therefore reverse and remand for a new trial, at which appellant's stationhouse confession would be excluded.

DICKSON, J., concurs.