Bradley J. DAVIES, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 61A04–9910–CR–448.

Court of Appeals of Indiana.

June 15, 2000.

Rehearing Denied Aug. 15, 2000.

William G. Smock, Michael A. Slagle, Smock & Etling, Terre Haute, Indiana, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Teresa Dashiell Giller, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

KIRSCH, Judge

After a jury trial, Bradley J. Davies was convicted of two counts of child molesting as Class A felonies, and one count of child molesting as a Class C felony.[1] He now appeals, raising the following issues for review:

I. Whether Davies's pre-polygraph statement was voluntary and comported with his *Miranda* rights.

II. Whether the trial court erred in admitting audiotapes of Davies's pre-polygraph statement.

III. Whether the results of Davies's polygraph examination were admissible, in that his consent was voluntary, the test was performed pursuant to a valid stipulation, and the results were reliable.

IV. Whether Davies's post-polygraph statement was voluntary.

V. Whether Davies's convictions are supported by sufficient evidence.

VI. Whether Davies's convictions violate double jeopardy.

VII. Whether the trial court erred in sentencing Davies.

We affirm in part and reverse in part.

---

1. *See* IC 35–42–4–3.

## FACTS AND PROCEDURAL HISTORY

On October 11, 1998, twenty-three-month-old K.S. drowned. While cleaning the body, Marjorie Frey, a morgue technician, noticed a possible rectal tear. Dr. Roland Kohr performed an autopsy and found evidence that K.S. had been sexually abused.

Davies, who lived with K.S.'s mother, Melissa Stinson, heard news reports about injuries to the child not caused by the drowning and contacted police, insisting on discussing the matter. He and Stinson went to the Parke County Sheriff's Department, where each was interviewed separately in the conference room. Deputy Randy Kneeland conducted Davies's interview; Conservation Officer Kent Hutchins was also present. During Davies's interview, he admitted that he molested the child, then retracted his admission and agreed to take a polygraph examination.

Kneeland and Hutchins transported Davies to Boone County, where Kneeland had arranged for the polygraph to be administered by Boone County Sheriff Ern Hudson, who was a certified polygraph examiner. Hudson read Davies a standard interrogation form and a polygraph waiver of rights form, both of which contained the *Miranda* warnings. Hudson then read to Davies a written polygraph stipulation. Davies signed all three documents. Davies failed his polygraph test, and after again receiving the *Miranda* warnings, gave a more complete confession both in his post-polygraph interview and in the car on the return trip to Parke County.

The jury convicted Davies as charged. The trial court sentenced him to fifty years' imprisonment on each Class A felony conviction, and eight years' imprisonment on the Class C felony conviction, all to run concurrently. He now appeals.

## DISCUSSION AND DECISION

### I. Pre-polygraph statement

Davies first argues that the statement he made before he took the polygraph test was inadmissible. He argues that the pre-polygraph statement was involuntary and was taken in violation of his *Miranda* rights.

### A. Voluntariness

■ Davies claims that his pre-polygraph statement should not have been admitted at trial because it was not voluntary. He argues that the totality of the circumstances suggest that police coercion overcame his free will.

■ The decision whether to admit a defendant's statement is within the discretion of the trial court. *Schmitt v. State*, 730 N.E.2d 147, 148 (Ind.2000). On appeal from a determination that the accused's statement was admissible, we do not weigh the evidence nor resolve questions of credibility, but consider the evidence which supports the decision of the trier of fact in the case of contested evidence and any uncontested evidence presented by the appellant. *Snellgrove v. State*, 569 N.E.2d 337, 343 (Ind.1991). The trial court's finding will be upheld if there is substantial evidence of probative value to support it. *Id.*

■ The State has the burden of proving beyond a reasonable doubt that the confession was voluntary and not induced by violence, threats, promises, or other improper influences so as to overcome the free will of the accused at the time he confessed. *Id.* (citing *Taylor v. State*, 479 N.E.2d 1310 (Ind.1985)). When we review the voluntariness of a confession, we take into consideration the entire record and look at the totality of the circumstances. *Johnson v. State*, 584 N.E.2d 1092, 1099 (Ind.1992), *cert. denied*, 506 U.S. 853, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992); *Patterson v. State*, 563 N.E.2d 653, 655 (Ind.Ct.App.1990). Among other circumstances, we consider "inconsistencies in the defendant's statement, explicit or implicit promises by police interrogators, and the coercive nature of the interroga-

tion atmosphere." *Patterson,* 563 N.E.2d at 655. "Coercive police activity is a necessary prerequisite to finding a confession is not 'voluntary' within the meaning of the due process clause of the fourteenth amendment." *Id.* (citing *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986)).

Davies argues that the factors cited in *Patterson* demonstrate that his statement was not voluntary. He cites the numerous inconsistencies in his answers in the interview, in which he admitted molesting K.S., then retracted his previous statement. Davies also argues that the atmosphere of the interview was coercive because of the interrogation tactics used by Kneeland, and the fact that he had slept and eaten inadequately at the time of the interview.

■ A review of the entire record discloses that Kneeland was never rude, threatening, or abusive to Davies throughout the interview. On the contrary, Kneeland and Hutchins were respectful throughout the process, offered Davies food and water, and took a break in the middle of the interview. While Kneeland did use forceful questioning techniques, standard police interrogation does not equate to coercion. *See Houser v. State,* 678 N.E.2d 95, 102 (Ind.1997) (confession not rendered involuntary by officers' use of typical interview techniques such as "good cop, bad cop"); *French v. State,* 540 N.E.2d 1205, 1207 (Ind.1989) (statement properly admissible where defendant treated kindly and politely, was allowed to use the bathroom, was given water, and was allowed to take breaks while giving his statement); *Clephane v. State,* 719 N.E.2d 840, 842 (Ind.Ct.App.1999) (defendant's statement voluntary where he returned caseworker's telephone call and went to the office for an interview, knowing that he was free to go at any time).

### B. *Miranda*

■ Davies next contends that the trial court erred in admitting his pre-polygraph statement because the statement was given in violation of his *Miranda* rights. The *Miranda* warnings were designed to secure the criminal defendant's constitutional right against compulsory self-incrimination. *Hayes v. State,* 667 N.E.2d 222, 225 (Ind.Ct.App.1996), *trans. denied; Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A defendant is entitled to receive *Miranda* warnings if he is subject to custodial interrogation. *Hurt v. State,* 694 N.E.2d 1212, 1217 (Ind.Ct.App.1998), *trans. denied, cert. denied,* 525 U.S. 1008, 119 S.Ct. 525, 142 L.Ed.2d 435 (1998) (citing *Cliver v. State,* 666 N.E.2d 59, 66 (Ind.1996)). A defendant is in custody if he is formally arrested or is subjected to restraints on his freedom such that a reasonable person in defendant's position would believe he is not free to leave. *Id.* (citing *Pasco v. State,* 563 N.E.2d 587, 593 (Ind.1990)).

■ When an accused is subjected to custodial interrogation, the prosecution may not use statements stemming from that interrogation unless it demonstrates the use of procedural safeguards effective to secure the accused's privilege against self-incrimination. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. The *Miranda* warnings apply only to custodial interrogation because they are meant to overcome the inherently coercive and police dominated atmosphere of custodial interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

Courts have examined the concept of "custody" in numerous cases. For instance, in *Clephane,* 719 N.E.2d at 840, the defendant contended that his statement was inadmissible because he was not advised of his *Miranda* rights. In that case, a caseworker was investigating the possible sexual abuse of a teenager. The caseworker contacted the defendant and asked him to come to her office for an interview. Once at the office, the defendant volunteered that he knew the purpose of the investigation. This statement was offered against him at trial.

The court held that the defendant was not entitled to *Miranda* warnings because he was not in custody at the time he made the damaging statement. *Id.* at 842. He voluntarily returned the caseworker's telephone call and came to her office, and he knew that he was at all times free to leave, and in fact, left at one point and came back. *Id.* Because a person in the defendant's position would not believe that he was prohibited from leaving, he was not in custody. Therefore, no *Miranda* warnings were needed and the defendant's statements were admissible. *Id.* at 842–43.

Similarly, in *Zook v. State*, 513 N.E.2d 1217 (Ind.1987), police were investigating a fire. Eventually, they narrowed their investigation to the defendant. An officer telephoned the defendant and asked him to come to the station for an interview. He agreed and voluntarily accompanied the officers to an interview room. The questions were thorough, but polite, considerate, and not aggressive. The defendant asked if he was under arrest and was told he was not. Our supreme court held that these circumstances did not constitute custody, and the defendant's *Miranda* rights had therefore not yet attached. *Id.*

In this case, Davies initiated the contact between himself and law enforcement by calling to inquire about the news report he heard. Hutchins testified that he did not want to question Davies on that day because it was the day of K.S.'s funeral, but Davies insisted on speaking with him about the report. Once Davies arrived at the Sheriff's Department, he was free to leave at all times and went outside the building by himself to smoke on at least one occasion. A reasonable person in Davies's situation would not have believed he was prohibited from leaving. Therefore, Davies was not in custody when he gave his pre-polygraph statement, and no *Miranda* warnings were therefore necessary.

Nonetheless, Davies refers us to *State v. Aynes*, 715 N.E.2d 945 (Ind.Ct.App.1999), in which this court affirmed the decision of the trial court to suppress the defendant's statements as the product of custodial interrogation without the benefit of *Miranda* advisements. In that case, police went to the defendant's place of employment and told him that a criminal allegation had been made against him. An officer then asked the defendant if he would come to the Sheriff's Department to talk about it. The defendant agreed and drove himself to the Sheriff's Department. The officer led the defendant through the lobby to a secure area of the building which was locked to both entry and exit. There, he questioned the defendant, who after initially denying the allegation, eventually confessed. The trial court held that the defendant was in custody and should have been advised of his *Miranda* rights. Because he was not, his statement was inadmissible. The State appealed.

On appeal, we affirmed the trial court. *Id.* at 950. We noted that the interrogation was conducted in a secure area of the building, and the investigation had already focused on the defendant. Therefore, we held that the trial court did not abuse its discretion in suppressing the statement. *Id. See also Dickerson v. State*, 257 Ind. 562, 276 N.E.2d 845 (1972) (interrogation initiated by police at police station in investigation which had focused on defendant did constitute custody for purposes of *Miranda*); *Johnson v. State*, 484 N.E.2d 49 (Ind.Ct.App.1985) (*Miranda* applies even where defendant goes to police station voluntarily at the request of police if victim had already identified him as attacker).

Unlike in *Aynes*, in this case, the interview was conducted in a room into which entry was secure, but which could be exited at any time. Davies understood this and had gone outside alone to smoke. Further, at the time of the interrogation, the investigation had not focused on Davies. Finally, the procedural posture of this case is a critical distinction. *Aynes* was the appeal of a trial court's decision to suppress the statement. Here, the trial court's decision was to admit the statement. Our holding in both cases is essen-

tially the same: the trial court's decision in the circumstances was not an abuse of discretion.

Here, Davies's statement was voluntary, and he was not in custody, so *Miranda* warnings were not necessary. The trial court did not err in admitting the pre-polygraph-statement.

### C. Harmless error

■■■■ Even if Davies's pre-polygraph statement was taken in violation of *Miranda*, the error in this case was harmless. Statements obtained in violation of *Miranda* and erroneously admitted are subject to harmless error analysis. *Alford v. State*, 699 N.E.2d 247, 251 (Ind.1998) (citing *Houser*, 678 N.E.2d at 102 n. 8 (Ind. 1997)). A federal constitutional error is reviewed de novo and must be "harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A reviewing court must be satisfied that the State has "met its burden of demonstrating that the admission of the confession … did not contribute to [the] conviction." *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The court must find that the error did not contribute to the verdict, that is, that the error was unimportant in relation to everything else the jury considered on the issue in question. *Id.* (citing *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), *disapproved on other grounds by Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

The admission of Davies's pre-polygraph statement was harmless under this standard. The statement contained a very general, quickly retracted admission that Davies molested K.S. This evidence was cumulative of the much more detailed confession Davies provided after his polygraph examination. Moreover, the jury heard the opinion of two polygraph experts that Davies was being deceptive during his polygraph examination. We conclude that the pre-polygraph statement did not contribute to the guilty verdict here.

### II. Admission of audiotapes

■■■■ Davies next argues that the trial court erred in admitting audiotapes of his pre-polygraph interview that Kneeland conducted of Davies when he first came to the Sheriff's Department. Davies argues on appeal that the audiotapes were of such poor quality as to be inadmissible. The admission or exclusion of evidence is a matter left to the sound discretion of the trial court, and we will only reverse upon abuse of that discretion. *Newman v. State*, 719 N.E.2d 832, 835 (Ind.Ct.App. 1999), *trans. denied* (2000); *Strangeway v. State*, 720 N.E.2d 724, 726 (Ind.Ct.App. 1999). After the State began playing the tapes, the trial court determined that they were not of sufficient clarity as to be understood by the jurors without assistance. It then allowed the State to give jurors a written transcription of the tapes, but admonished jurors that the tapes were the evidence and they should rely on what they heard, not what they read. Davies argues that if the tapes were not clear enough to hear, they should not have been admitted at all.

■■■■ Admitting the tapes was within the discretion of the trial court. The tapes were relevant, authentic, and sufficiently audible to be helpful to the jury. Further, we disregard errors in the admission of evidence where its admission does not affect the substantial rights of a party. *Jones v. State*, 708 N.E.2d 37, 40 (Ind.Ct. App.1999), *trans. denied.* Here, even if admitting the tapes was error, it was merely cumulative of other evidence that Davies confessed to molesting K.S. Therefore, any error in the admission of the tapes was harmless. *See Johnston v. State*, 541 N.E.2d 514, 515 (Ind.1989) (no error in giving jury transcript of tape admitted into evidence where sole purpose was to help jury in understanding and jury was instructed that if tape differed from transcript, they should consider only tape).

### III. Polygraph examination

Davies next challenges the results of the polygraph examination on three bases. He claims that his waiver of rights prior to taking the polygraph examination was invalid. He also argues that the polygraph stipulation he signed was invalid. Finally, he contends that the conditions of the examination were so poor as to render the results inherently unreliable, and therefore the results should be inadmissible. We address each of these in turn.

### A. Validity of waiver

■ Davies argues that the waiver of his rights that he signed prior to taking the polygraph examination was invalid. The State bears the burden of proving beyond a reasonable doubt that a defendant voluntarily and intelligently waived his *Miranda* rights. *Johnson,* 484 N.E.2d at 51. If the record contains substantial evidence of probative value to support the trial court's ruling, we will affirm it. *Id.*

During Davies's initial interview with police, he requested to take a polygraph examination. The officer conducting the interview, Kneeland, stopped the interview, and contacted the prosecuting attorney, who prepared and signed a polygraph stipulation, and arranged for Boone County Sheriff Ern Hudson to administer the test. Kneeland and Hutchins then transported Davies to the Boone County Sheriff's Department.

The two officers arrived at the Boone County Sheriff's Department with Davies, who was not under arrest and was not wearing handcuffs. Hudson testified that everyone was cordial and respectful throughout the proceedings. Prior to starting the exam and out of the presence of Kneeland and Hutchins, Hudson asked Davies whether he wanted to take a polygraph test. He explained to Davies what a polygraph exam would entail and that the subject matter of the examination was Davies's possible involvement in sexual abuse of K.S. He then confirmed that Davies wanted to take the exam. He read Davies

his *Miranda* warnings from a written standard advice of rights interrogation form, checking off each line as he read. After he read the form to Davies, he asked Davies if he had any questions about his rights. Davies responded that he did not, and signed the form.

The form was admitted into evidence at trial and accurately and fully disclosed to Davies his *Miranda* rights. It explained that he had the right to remain silent; that anything he said could be used against him in court; that he had the right to talk to a lawyer before questioning and to have a lawyer present during questioning; that if he could not afford a lawyer, one would be appointed for him before questioning; and that he had the right to stop answering questions at any time. The interrogation form then reads:

"I have read the statement of my rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

*Record* at 1295. Davies's signature appears at the end of this paragraph.

Hudson then read a second form to Davies. This form was specific to polygraph examinations. Again, Hudson checked off each line as he read. He then gave Davies an opportunity to read the form himself. Davies stated that he had no questions and signed this form as well. This polygraph waiver form contains the same information about Davies's rights, then states:

"I have read the above statement of my rights, and it had been read to me. I understand what my rights are. I do wish to take the polygraph test. No force, threats, or promises of any kind or nature have been used by anyone in any way to influence me to waive my rights. I am signing this statement af-

ter having been advised of my rights and before taking the polygraph test."

*Record* at 1296.

The trial court determined that the State had met its burden of showing that Davies voluntarily and intelligently waived his rights prior to taking the polygraph examination. This determination is supported by ample evidence in the record. Davies's waiver was valid.

### B. Stipulation

 Davies next argues that the polygraph stipulation he signed prior to taking the polygraph test is invalid and precludes the use of the results at trial. Absent some form of waiver or stipulation by the parties, the results of polygraph examinations administered to criminal defendants are not admissible. *Sanchez v. State,* 675 N.E.2d 306, 308 (Ind.1996). In *Sanchez,* our supreme court stated that:

> "[t]here are four prerequisites which must be met before the trial court may admit polygraph test results: 1) that the prosecutor, defendant, and defense counsel all sign a written stipulation providing for the defendant's submission to the examination and for the subsequent admission at trial of the results; 2) that notwithstanding the stipulation, the admissibility of the test results is at the trial court's discretion regarding the examiner's qualifications and the test conditions; 3) that the opposing party shall have the right to cross-examine the polygraph examiner if his graphs and opinion are offered in evidence; and 4) that the jury be instructed that, at most, the examiner's testimony tends only to show whether the defendant was being truthful at the time of the examination, and that it is for the jury to determine the weight and effect to be given such testimony."

*Id.* Davies essentially argues that the polygraph stipulation he signed fails the first prong of the *Sanchez* test.

In *Willey v. State,* 712 N.E.2d 434, 442 (Ind.1999), our supreme court held that polygraph results were erroneously admitted at trial because the parties' polygraph stipulation failed the first prong of the *Sanchez* test. In that case, the court found the stipulation to be ambiguous because it provided that the results of the test would be admissible at trial except for the chart recordings, the examiner's various worksheets, and all questions other than the relevant test questions. *Id.* at 440–41. The court reasoned that this provision created an ambiguity because these specifically excluded items would ordinarily be considered part of the polygraph test results. *Id.* Utilizing principles of ordinary contract construction, the court determined that this ambiguity had to be construed against the drafter of the contract, the prosecution. When done so, the stipulation failed the first prong of the *Sanchez* test, that the stipulation must provide for the admission of the polygraph test results. *Id.* at 441. Thus, the polygraph stipulation was invalid and the test results were erroneously admitted at trial.

Davies relies on *Willey* in arguing that the polygraph stipulation he signed was invalid. However, the ambiguous provision of the *Willey* stipulation is not contained in the stipulation signed by Davies. The analogous provision in this case reads:

> "Bradley J. Davies does hereby expressly waive .... and unequivocally agrees that said report of the polygraph examination may become a part of the record in said Court, as well as becoming an exhibit at a trial against Bradley J. Davies, as well as to ·stipulate taking the polygraph operator's deposition by interrogatories·(or otherwise) or to testify in open court."

*Record* at 1293. Thus, this provision creates no ambiguity with regard to what would be admissible at trial. Unlike in *Willey,* where the provision stated the test results would be admitted, then excluded items commonly referred to as the results, this paragraph provides for·the admission at trial of the results of Davies's polygraph examination. Moreover, the evidence ex-

plicitly excluded in *Willey,* the polygraph charts and the examiner's notes and worksheets, was actually admitted here. This provision meets the *Sanchez* test. The trial court did not err in admitting the polygraph results on this basis.

■ Davies also argues that the stipulation was invalid because it is unconscionable. Specifically, he argues that he was not represented by counsel at the time he entered the stipulation and he was acting under duress. Davies was proceeding without counsel at this phase of the investigation by his own election. He had been advised of his *Miranda* rights and knew that he had the right to halt the proceedings and have counsel appointed for him. He chose to sign the waivers and the stipulation. We have already held that his waiver of his rights was valid; we will not use this forum to revisit this issue. Moreover, any duress felt by Davies was insufficient to vitiate the stipulation. It was a stressful time for Davies. Kneeland had confronted Davies directly about his possible involvement with the sexual abuse of K.S., and Davies had confessed, then retracted his statement. This latter circumstance, however, was of Davies's own creation. Moreover, it was Davies who insisted on taking a polygraph examination. We do not feel that these circumstances show that the polygraph stipulation was so unconscionable so as to be unenforceable.

### C. Reliability of examination

■ Davies argues that the exam was conducted under improper conditions, thus making the results inherently unreliable. Specifically, he argues that the examination was conducted by a law enforcement official, who could not be expected to conduct a fair and impartial exam.

Hudson, a certified polygraph examiner, conducted Davies's examination. Hudson was also the Sheriff of Boone County, but was in no way connected to the investigation being conducted by Conservation Officer Hutchins or the Parke County Sheriff's

Department. Indeed, when Kneeland contacted Hudson to arrange the polygraph, he did not tell Hudson of Davies's admission. Instead, Kneeland only told Hudson that they were investigating a case of possible sexual abuse and that Davies had requested a polygraph. Thus, Hudson was not privy to any details that would bias him toward reading Davies's test results as deceptive.

Hudson testified at length at the motion to suppress hearing and at the trial about his procedures in administering polygraph examinations. The examination consisted of relevant and control questions. He reviewed the questions with Davies before the test began, giving Davies the opportunity to object to the questions. Davies did object to one of the questions, and Hudson reworded the question so that Davies could answer it honestly. Further, Hudson testified that in administering a polygraph, his duty is to the examinee to ensure that the test results are accurate. Davies points to no conduct on the part of Hudson that would call into question his integrity in administering the test. We see nothing in this procedure to undermine our confidence in the test results. Further, under *Sanchez,* the trial court's decision to admit the results of a polygraph examination is reviewed for an abuse of discretion. The trial court did not abuse its discretion in admitting the test results here.

■ Davies also asserts that his physical and emotional state at the time of the polygraph examination was not conducive to obtaining accurate results. He notes that he had been with police for nearly six hours at the time of the exam, that he had slept only six hours the previous night, that he had not eaten since dinner the night before, and that his girlfriend and her daughter, K.S., had just been in an accident which claimed K.S.'s life.

Davies had been with police for almost six hours at the time of the polygraph by choice. He contacted police and insisted on speaking with them about the investiga-

tion. He was never under arrest and was free to leave at any time. In fact, he did go outside the Sheriff's Department building unescorted during the day to smoke. Further, his involvement with police was prolonged by the polygraph examination which he requested and could have refused or stopped at any time. The officers offered Davies food and drink periodically throughout the day, but he declined. Even so, they did not eat in front of him; Kneeland and Hutchins ate lunch while Hudson administered the polygraph examination. Overall, we do not feel that these circumstances are so overwhelming as to cause the results of the polygraph exam to be unreliable.

### IV. Post-polygraph admissions

■■■ Davies next contends that the trial court erred in admitting his post-polygraph statements. He claims that those admissions were not voluntary. In doing so, he argues that the statements were made after he was deceived about whether he had passed the polygraph test. Further, he claims that there were numerous signs of coercion including, among others, the fact that he did not consult an attorney, that Hudson interviewed him after the polygraph examination, and that Hudson spoke to him reassuringly, used threats, and promised to speak with the court about Davies if he cooperated.

After the polygraph test concluded, Hudson examined the results of the polygraph and determined that Davies was not being truthful. He told Davies about his interpretation of the results and asked Davies again if he had sexually touched K.S. At that point, Davies admitted to one such incident. After retracting his statement, Davies reconfirmed his original statement that he had molested K.S. He repeated this admission while being transported back to Parke County by Kneeland and Hutchins.

Hudson testified that he examined the polygraph charts, and in his opinion, Davies was not being truthful. He also testified that a post-polygraph interview is cus-

tomary when the subject fails the exam. Thus, he was following standard procedures in questioning Davies after the exam. Although Davies's experts testified that Davies passed the polygraph examination, the State's witnesses opined otherwise. This discrepancy was for the trier of fact to evaluate and does not indicate any bad faith on Hudson's part in questioning Davies after the examination. Further, our review of the record persuades us that Hudson did no more than politely confront Davies with the information that he had failed the polygraph and asked about his sexual involvement with K.S. We see no coercive actions that would render Davies's statement involuntary.

There was no error in admitting Davies's post-polygraph statements. By this point in the day, he had been read his *Miranda* rights multiple times and had elected to speak with the officers involved with the case without the benefit of representation by counsel. Further, Kneeland and Hutchins testified that Davies was not under arrest at any time prior to their return to Parke County, where they met another vehicle and transferred Davies to it for the trip to the jail. Thus, it is not clear that *Miranda* warnings were even required. Nonetheless, they were given, and there is no reason not to admit Davies's post-polygraph statements.

### V. Sufficiency of evidence

■■■ Davies claims there is insufficient evidence to support both of his convictions for Class A child molesting. When reviewing a claim of insufficient evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Smith v. State,* 688 N.E.2d 1289, 1290 (Ind. Ct.App.1997). We look only to the evidence and the reasonable inferences therefrom that support the verdict. *Ajabu v. State,* 704 N.E.2d 494, 495 (Ind.Ct.App. 1998). We will affirm a conviction if there is substantial evidence of probative value from which the trier of fact could find the defendant guilty beyond a reasonable

doubt. *Id.* Reversal is mandated where, after reviewing such evidence, the reviewing court concludes that no reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997).

Davies was convicted of Class A child molesting by performing sexual intercourse with K.S. and by deviate conduct, specifically, placing his finger inside K.S.'s vagina. IC 35–42–4–3 defines child molesting as performing or submitting to sexual intercourse or deviate sexual conduct with a child under fourteen years of age. IC 35–41–1–26 defines sexual intercourse as an act that includes any penetration of the female sex organ by the male sex organ. Deviate sexual conduct means an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object. IC 35–41–1–9. Dr. Roland Kohr, the pathologist who performed the autopsy on K.S.'s body, testified that his examination revealed a dilated rectum and hymeneal ring with no evidence of recent trauma. He testified that the anal enlargement was suspicious, but could have been caused either by natural relaxation following death or by penetration by an object. However, Dr. Kohr further testified that he found that K.S. had no hymeneal membrane. He opined that the obliterated hymen in a child so young was very strong evidence of sexual abuse and was caused by the insertion of an object larger than one centimeter in diameter into K.S.'s vagina.

During Deputy Kneeland's initial interview with Davies, Kneeland asked him directly if he had sexually abused K.S. Davies admitted that "it just happened one time." Davies then failed a polygraph examination designed to determine if he was being truthful in denying any sexual contact with K.S. The most damaging admission, however, came during the post-polygraph interview. After Hudson told Davies he had failed the polygraph, Da-

vies stated that the incident had occurred in late August on a Friday or Saturday night. Davies told Hudson that he and Stinson had been at a party where he drank several beers. He and Stinson went home and went to sleep. K.S., initially asleep in her room, came into the room where Davies and Stinson were sleeping and went to sleep on the floor. Davies woke up and lay down on the floor next to K.S. Davies stated that he put his hand under her diaper and stuck his finger in her vagina. He admitted that he was sexually aroused at the time. When Hudson asked if he placed his penis into K.S.'s vagina, he stated either "yes anything could have happened," *Record* at 1322 (Hudson testimony), or "it was possible." *Record* at 1390, 1457 (Kneeland & Hutchins testimony). He denied inserting anything into K.S.'s rectum. Davies repeated his admission in the car during the trip back to Parke County.

We find this evidence sufficient to support Davies's conviction of child molesting by placing his finger in K.S.'s vagina. However, the evidence is insufficient to support his conviction of child molesting by sexual intercourse. Dr. Kohr's testimony does not establish that the object that caused the obliteration of K.S.'s hymen was a penis, and the only evidence suggesting that Davies had intercourse with K.S. is Davies's comment that it could have happened or it was possible. Such evidence is of not of substantial probative value to support Davies's conviction. We therefore reverse Davies's conviction as to child molesting by committing sexual intercourse.

## VI. Double jeopardy

■■■ Davies argues that his convictions for Class A child molesting and Class C child molesting violate the prohibition against double jeopardy, or being punished twice for the same offense. Two or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged

crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Richardson v. State,* 717 N.E.2d 32, 49–50 (Ind.1999). Davies concedes that his convictions do not violate the first prong of *Richardson,* the same elements test, so we proceed to the second: the actual evidence test. The actual evidence test requires us to look at the evidence presented at trial to determine whether each challenged offense was actually established by separate, distinct facts. *Id.* at 53.

■ "Dual convictions cannot stand if a defendant 'demonstrate[s] a reasonable probability that the evidentiary facts used by the fact-finder to establish elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Wise v. State,* 719 N.E.2d 1192, 1201 (Ind.1999)(quoting *Richardson,* 717 N.E.2d at 53). In this case, Davies was convicted of one count of child molesting based on sexual intercourse, one count of child molesting based on criminal deviate conduct, and one count of child molesting based on fondling. Because we reverse Davies's conviction on the count alleging sexual intercourse, we need not analyze it under double jeopardy principles. Thus, we are left with the issue of whether his convictions for child molesting by criminal deviate conduct and by fondling constitute double jeopardy.

In this case, there is a reasonable probability that the jury used the same evidence to convict Davies of both molesting by fondling and molesting by criminal deviate conduct. Davies stated that there was one incident in late August 1998 during which he placed his finger inside K.S.'s diaper and inserted his finger in her vagina. There was no independent evidence of fondling. Therefore, we hold that Davies's convictions for both molesting by fondling and molesting by criminal deviate conduct

violate the prohibition against double jeopardy. Thus, we reverse Davies's conviction for child molesting by fondling as a Class C felony. *See Kochersperger v. State,* 725 N.E.2d 918 (Ind.Ct.App.2000) (vacating conviction for child molesting by fondling where defendant was also convicted of child molesting by deviate conduct for single incident of child molesting).

## VII. Sentencing

■ The trial court sentenced Davies to fifty years' imprisonment,[2] the maximum possible sentence. Davies argues that the trial court erred in failing to find no mitigating circumstances. Specifically, he alludes to the facts that he had no prior criminal history and was known throughout his community for being a hardworking and honest person. He claims that the trial court's failure renders his sentence manifestly unreasonable.

■ Trial courts are granted broad discretion in imposing sentences, and we will reverse a sentencing decision only for an abuse of that discretion. *Trice v. State,* 693 N.E.2d 649, 652 (Ind.Ct.App.1998). A trial court's wide discretion extends to the determination of whether to increase presumptive penalties, impose consecutive sentences on multiple convictions, or both. *Madden v. State,* 697 N.E.2d 964, 967 (Ind. Ct.App.1998), *trans. denied.* When a sentence is enhanced or consecutive sentences are imposed, the trial court must set forth a statement of its reasons for selecting a particular punishment. *Id.* We will examine both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether the trial court adequately explained the reasons for the sentence. *Newsome v. State,* 654 N.E.2d 11, 13 (Ind.Ct.App.1995), *trans. denied.*

■ The trial court is solely responsible for determining the appropriate weight to accord aggravating and mitigat-

---

**2.** Because we reverse Davies's convictions on count I and count III on other grounds, we address only his sentence on count II here.

ing factors in sentencing. *Shields v. State,* 523 N.E.2d 411, 414 (Ind.1988). Even where the trial court considers improper aggravators in imposing a sentence, the sentence will be affirmed if it is otherwise supported by a legitimate aggravator. *Spivey v. State,* 638 N.E.2d 1308, 1313 (Ind.Ct.App.1994). A single aggravator is sufficient to support the imposition of enhanced or consecutive sentences. *Id.*

■ The finding of mitigating circumstances is within the discretion of the trial court. *Hackett v. State,* 716 N.E.2d 1273, 1277–78 (Ind.1999) (citing *Legue v. State,* 688 N.E.2d 408, 411 (Ind.1997)). An allegation that the trial court failed to identify or find a mitigating circumstance requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Id.* (citing *Carter v. State,* 711 N.E.2d 835, 838 (Ind.1999)). The trial court is not obligated to accept the defendant's contentions as to what constitutes a mitigating circumstance. *Id.*

In this case, the trial court found the following aggravators: that Davies was lacking in character; that there was a risk that Davies would commit another crime; that the victim was in a position of trust with Davies; and that Davies had pending charges and other uncharged acts of sexual misconduct with a minor.

■ IC 35–38–1–7.1 requires the trial court to consider the risk that the defendant will commit another crime in imposing a sentence. Further, a defendant's record of arrests may be relevant to the trial court's assessment of the defendant's character in terms of the risk that he will commit another crime. *Bluck v. State,* 716 N.E.2d 507, 513–14 (Ind.Ct.App. 1999) (citing *Taylor v. State,* 695 N.E.2d 117, 121 (Ind.1998)). In assessing a defendant's criminal history and enhancing a sentence, a sentencing court may consider pending charges and uncharged crimes. *Flinn v. State,* 563 N.E.2d 536, 544 (Ind. 1990) (citing *Jordan v. State,* 512 N.E.2d

407 (Ind.1987)); *Bluck,* 716 N.E.2d at 513–14 (citing *Fourthman v. State,* 658 N.E.2d 88, 92 (Ind.Ct.App.1995), *trans. denied* (1996)). The trial court properly cited Davies's criminal record as an aggravator and properly evaluated the risk that Davies would commit another crime by referring to his pending charges and uncharged misconduct.

The trial court also cited as an aggravator that Davies was in a position of trust with K.S. Being in a "position of trust" with the victim is a valid aggravating circumstance. *Bacher v. State,* 722 N.E.2d 799, 802 n. 5 (Ind.2000). Our supreme court has affirmed a finding that a live-in boyfriend is in a position of trust with regard to the children of his live-in girlfriend. *See, e.g., Martin v. State,* 535 N.E.2d 493, 498 (Ind.1989). Thus, the trial court properly used this aggravator here.

Davies, however, cites the trial court's failure to find his lack of criminal record and his good character as mitigators. As we have already noted, for purposes of sentencing, it is inaccurate to claim that Davies had no criminal record. Further, while Davies refers us to the evidence at his sentencing hearing of his good character, including the testimony of his employer, parents, and neighbors, he ignores the fact that the evidence on this issue was conflicting. There was evidence that he attempted to have sexual intercourse with Stinson in front of two-year-old K.S., that he asked K.S. to perform a sex act on Stinson, that he was involved with a fourteen-year-old girl, and that he was involved with a fifteen-year-old girl, including having sex with her while Stinson was present. The evidence of Davies's good character was not clearly supported by the record, was conflicting at best, and the trial court was entitled to weigh the evidence as it saw fit. The trial court did not err in failing to find Davies's good character as a mitigating circumstance. Further, in light of the nature of the offense and the character of the offender, we do not be-

lieve that Davies's sentence was plainly, clearly, and obviously unreasonable.

Affirmed in part and reversed in part.

BAKER, J., and RILEY, J., concur.